United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 16, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 24-90052 |
| ROBERTSHAW US HOLDING CORP., *et al.*, | § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

**MEMORANDUM DECISION ON PLAN CONFIRMATION**
(RE: ECF NO. 857)

Robertshaw and its affiliates ("**Robertshaw**") specialize in creating solutions used in everyday appliances. It is likely that your refrigerator, clothes washer, dryer, dishwasher, cooking range, or central heating system includes a Robertshaw product. The company employs over 5,000 people across many countries. And all of their U.S. inventory is located in facilities in Laredo and Brownsville, Texas.

Before these chapter 11 cases started, Robertshaw experienced significant business and financial challenges ranging from supply chain issues to increased material, labor, and logistics costs. At the same time, Robertshaw was also embroiled in a bitter dispute about liability management transactions with certain lenders and its equity sponsor.

Robertshaw started these chapter 11 cases in February 2024 to pursue a value maximizing sale of assets and to resolve claims asserted in prepetition lawsuits about the liability management transactions. Over the past six months, much has happened. The Court has addressed debtor-in-possession financing issues, bidding procedures for an auction for the sale of substantially all of Robertshaw's assets, approved a sale for the assets with a credit bid, and presided over an adversary proceeding involving liability management disputes. Everything has been hotly contested.

The Court now considers confirmation of the *First Amended Joint Plan of Liquidation of Robertshaw US Holding Corp. and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* ("**Plan**"). The Plan is supported by an ad hoc group of Robertshaw's secured creditors, its equity sponsor, and the Official Committee of Unsecured Creditors ("**UCC**"). All objections have been resolved except from two objectors.

Invesco Senior Secured Management, Inc. and certain related funds ("**Invesco**") object to plan confirmation for several reasons, including a global settlement with the UCC embodied in the Plan, plan classification under Bankruptcy Code § 1122, unfair discrimination under § 1129(b)(1), and plan feasibility under § 1129(a)(11). Separately, the U.S. Trustee alleges the opt-out feature for consensual third-party releases under the Plan is improper in light of the recent U.S. Supreme Court decision in *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024). For the reasons stated below, each of the objections is overruled. The Court confirms the Plan.

## Jurisdiction and Venue

The Court has jurisdiction under 28 U.S.C. § 1334(b). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(L). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011).

## Background

The record ("**Record**") established to support confirmation of the Plan includes:

All documents identified on Robertshaw's Amended Witness and Exhibit List (ECF Nos. 868, 870), including:

- the Plan;

- Disclosure Statement related to the Plan;

- Settlement Term Sheet with the UCC;

- First Amended Plan Supplement;

- Declaration Alex Orchowski of Kroll Restructuring Administration LLC, including the voting and tabulation reports annexed to the declaration ("**Voting Report**");

- Declaration of Stephen Spitzer of AlixPartners (as modified on the record at the hearing);

- Declaration of Scott D. Vogel, Independent Director (as modified on the record at the hearing);

- Declaration of Neil Goldman, Independent Director (as modified on the record at the hearing); and

- Declaration of Andrew Scruton of FTI Consulting, Inc.

All documents identified on the Witness and Exhibit List (ECF No. 839) filed by One Rock Capital Partners, LLC ("**One Rock**"), including all documents filed in Adversary Case No. 24-03024 (the adversary proceeding about the liability management transactions).

All documents identified on the Witness and Exhibit List (ECF No. 840) filed by the Ad Hoc Group (defined below), including:

- June 20, 2024 Memorandum Decision and Order (Adv. Proc. No. 24-03024, ECF No. 351);

- Super-Priority Credit Agreement, dated May 9, 2023 (Adv. Proc. No. 24-03024, ECF No. 2-1);

- Trial Day 2 (May 24, 2024) Transcript (Adv. Proc. No. 24-03024, ECF No. 325);

- Trial Day 4 (May 29, 2024) Transcript (Adv. Proc. No. 24-03024, ECF No. 336); and

- Trial Day 5 (May 30, 2024) Transcript (Adv. Proc. No. 24-03024, ECF No. 339).

All documents identified on Invesco's Witness and Exhibit List (ECF No. 836), including all documents filed in these chapter 11 cases.

No objecting party elected to cross examine a witness or offer counter-fact or expert testimony at the confirmation hearing. So all statements in the Declarations referenced above in support of plan confirmation (as modified on the record at the confirmation hearing) are unrefuted.

The undisputed evidence admitted into the Record in support of confirmation demonstrates, by a preponderance of the evidence, that the Plan is confirmable and should be confirmed. The Plan satisfies all applicable requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. The Plan is in the best interests of Robertshaw and the estates.

All consensual resolutions to objections to confirmation—including an objection from the U.S. Trustee about exculpations in the Plan—as stated on the record at the confirmation hearing are in the best interests of Robertshaw and the estates and supported by the Record. All objections to confirmation that were not withdrawn or resolved by agreement at or before the confirmation hearing are overruled for the reasons stated below.

The findings and conclusions in this Memorandum Decision are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052, made applicable to Plan confirmation under Bankruptcy Rule 9014. Factual and legal conclusions will be treated as such; however they are labeled.

Below is a brief background about important matters in these chapter 11 cases that relate to Plan confirmation. Much of the background about the prepetition litigation and a significant adversary proceeding are detailed in the Court's June 2024 decision in Adv. No. 24-03024 ("**Adversary Decision**"). The Record includes the Adversary Decision and all documents admitted in the adversary proceeding.[1] Many important facts in the Adversary Decision are repeated below to provide a thorough description.

### Robertshaw's Prepetition Liability Management Transactions and Related History with Prepetition Lenders

In 2018, an affiliate of One Rock acquired Robertshaw from its prior sponsor.[2] The purchase was financed with $510 million in first-lien term loans under a First-Lien Credit Agreement, $110 million in second-lien term loans under a Second-Lien Credit Agreement (together, the "**Original Credit Agreements**"), and about $260 million of equity.[3] To finance operations, Robertshaw entered a separate asset-based revolving facility maturing in December 2023 ("**ABL Facility**").[4]

### I.    The May 2023 Uptier Transaction

In May 2023, Robertshaw negotiated a liability management transaction with Bain Capital Credit, LP on behalf of certain of its managed funds ("**Bain Capital**"), Canyon Capital Advisors LLC on behalf of certain of its managed funds ("**Canyon Capital**"), Eaton Vance Management on behalf of certain of its managed funds ("**Eaton Vance**") (collectively, the "**Ad Hoc Group**"), and Invesco under the Original Credit Agreements.[5] Invesco and the Ad Hoc Group formed an ad hoc group to reach "Required Lender" status. The lenders proposed a transaction through which the parties would amend the Original Credit Agreements to (i) execute a new Super-Priority Credit Agreement ("**SPCA**"), (ii) provide $95

---

[1] Footnotes 2 through 68 are all citations to documents in Adversary Proceeding Case No. 24-03024, which were admitted under the witness and exhibit list filed at ECF No. 839 in Case No. 24-90052. Trial transcripts from the Adversary Proceeding are referenced throughout this decision as Tr.2 (ECF No. 325), Tr.3 (ECF No. 340), Tr.4 (ECF No. 336), Tr.5 (ECF No. 339), and Tr.6 (ECF No. 346).

[2] Tr.3 10:2–11.

[3] Tr.3 10:2–11.

[4] ABL Credit Agreement, Joint Exhibit 1, ECF No. 250-11.

[5] Tr.4 65:4–22, 407:2–14.

million of new First-Out New Money Term Loans, and (iii) allow participating lenders to exchange their existing first- and second-lien loans under the Original Credit Agreements for Second-Out and Third-Out Term Loans under the SPCA ("**May Transactions**").[6] This type of liability management transaction is often called an uptier. It was realized through a series of transactions in a short time span, the steps of which were laid out in advance.[7] The SPCA is governed by New York law.[8]

The SPCA adopted much of the same (or similar) language as the Original Credit Agreements, while making some changes thought prudent by the participating lenders then to try to protect their position.[9] This included adding blockers to protect against some future lender-on-lender type actions, but not all.[10] Matthew Brooks, a managing director at Invesco, testified that they "*limited* the ability to do another uptier" but outright "*eliminated* the ability to do any sort of dropdown transactions."[11] The SPCA did not materially change the definition of "Required Lender." Required Lender status, as the parties understood it, was designed to be fungible—whichever party or group meets the status may fluctuate from time to time as debt is bought or traded or ad hoc groups form and dissemble.[12] The dispositive authority on which party or group holds enough debt to be Required Lender is a register maintained by an Administrative Agent.[13]

The SPCA defines "Required Lender" to mean "[l]enders having Loans representing more than 50.0% of the sum of the total First-Out New Money Term Loans and Second-Out Term Loans at such time."[14] Section 9.02 of the SPCA allows Required Lenders to amend the SPCA, subject to enumerated exceptions (commonly referred to as "sacred rights").[15] Required Lender status gives lenders the right to, among other things, (i) agree with Robertshaw, as "Borrower," to incur additional "Indebtedness," including, but not limited to, the issuance of more term loans under the SPCA; (ii) consent to or waive any breaches, defaults, or "Events of Default";

---

[6] Super-Priority Credit Agreement at Recitals, ECF No. 250-1.
[7] Tr.4 306:3–307:18.
[8] Super-Priority Credit Agreement, § 9.10, Joint Exhibit 1, ECF No. 250-1.
[9] Tr.4 256:13–258:21, 409:22–410:15.
[10] Tr.4 409:22–410:15.
[11] Tr.4 409:22—410:15.
[12] Tr.4 256:13—260:15.
[13] Super-Priority Credit Agreement, § 9.05(b)(iv), Joint Exhibit 1, ECF No. 250-1; Tr.4 25:22–25.
[14] Super-Priority Credit Agreement, § 1.01 "Required Lender," Joint Exhibit 1, ECF No. 250-1.
[15] Super-Priority Credit Agreement, § 9.02(b)(A), Joint Exhibit 1, ECF No. 250-1.

and (iii) direct the Administrative Agent to pursue remedies in the event of a breach, default, or Event of Default.[16]

Around July 2023, Invesco acquired more than 50% of the total First-Out and Second-Out Term Loans issued in connection with the May Transactions and obtained Required Lender status.[17] The Ad Hoc Group did not know about this change.[18] Invesco met the Required Lender criteria because it owned a majority of the First-Out Term Loans but not the Second-Out Loans.[19] So the status was arguably fragile. Another lender (or group of lenders) could buy up the majority of the Second-Out Term Loans and Robertshaw could pay down some of the First-Out Term Loans. In that case, Invesco would cease to be a Required Lender.

## II.   Invesco Led Amendment Nos. 1-4

Robertshaw faced another liquidity crunch in the Fall of 2023, despite its efforts to implement a turnaround plan supported by the company's advisors and One Rock.[20] A key component of this plan involved improving its customer relationships and contracts.[21] To address its liquidity issues and continue forward, it was close to entering into the "**Brigade Deal**," which would have refinanced the ABL facility set to mature in December 2023 and provided a cash infusion to Robertshaw to make interest payments due under the SPCA.[22]

Invesco found it troubling that, though it was Required Lender, the company sought financing from an outside source it believed to be a historically "difficult counterparty."[23] Invesco reached out through joint counsel to the ad hoc group that participated in the May Transactions to inform Robertshaw that it would not support the Brigade Deal.[24] Invesco also believed the ad hoc group of lenders disbanded once the SPCA was effective.[25] So it did not inform the other lenders that it had retained separate counsel to start working on amendments to the SPCA because Robertshaw had missed an interest payment, and the grace period was almost up.[26]

---

[16] Super-Priority Credit Agreement, § 9.02, Joint Exhibit 1, ECF No. 250-1.

[17] Tr.4 321:6–10.

[18] Tr.4 167:5–23, 322:1–23.

[19] Tr.4 15:19–16:3, 322:2–23; Plaintiff Exhibit 78 at 2786, ECF No. 243-29.

[20] Tr.3 32:22–34:23.

[21] Tr.3 32:22–34:23.

[22] Tr.6 10:1–11:25, 12:6–19.

[23] Tr.4 54:8–55:21, 335:7–336:13.

[24] Tr.4 336:22–347:5.

[25] Tr.4 68:6–69:22, 320:3–16.

[26] Tr.4 74:22–75:4, 77:1–17, 164:24–165:7, 168:20–169:8.

Invesco and Robertshaw entered into Amendment No. 1 on October 5, 2023.[27] It extended Robertshaw's grace period to make the missed interest payment due at the end of September to October 13.[28] Without this amendment, failure to make the payment by October 6, 2023 would have resulted in an "Event of Default."[29]

At the same time, the parties discussed a proposal for Robertshaw to enter into a new ABL facility. Invesco offered Robertshaw a bridge loan of $17 million in the form of additional First-Out Term Loans in exchange for Robertshaw's agreement to negotiate two other financing transactions with Invesco, including (i) a new $40 million "delayed draw term loan facility" conditioned upon Robertshaw's agreement to "repurchase" (i.e., uptier)[30] "100% of the Invesco owned Third-Out Term Loans at par" through "open market purchases" and (ii) a new $73.4 million ABL facility under which Invesco would exchange its Third-Out Term Loans for "New ABL Loans."[31] The Ad Hoc Group was not informed about this Amendment, the missed interest payment which necessitated the Amendment, or the financing proposal.[32]

Invesco and Robertshaw failed to negotiate the terms of Invesco's financing proposal. On October 13, 2023, Invesco and Robertshaw executed Amendment No. 2.[33] Invesco agreed to provide Robertshaw with the $17 million bridge loan in the form of new incremental First-Out Term Loans to make the missed interest payment. Mr. Brooks from Invesco testified that Invesco understood that Required Lenders could amend § 6.01 of the SPCA to allow for additional "Indebtedness"— which is permitted in Amendment No. 2.[34] To the extent this new "Indebtedness" could breach the terms of the SPCA, Invesco waived all potential defaults.[35] Invesco also committed to provide an additional $40 million term loan if certain conditions were met, but it set a November 8 deadline for Robertshaw to refinance the ABL Facility. It also included the potential for a new liability management transaction

---

[27] Amendment No. 1 To Super-Priority Credit Agreement at Preamble, Plaintiff Exhibit 1, ECF No. 242-1.

[28] Amendment No. 1 To Super-Priority Credit Agreement, §3, Plaintiff Exhibit 1, ECF No. 242-1.

[29] Amendment No. 1 To Super-Priority Credit Agreement at Preamble, Plaintiff Exhibit 1, ECF No. 242-1.

[30] Plaintiff Exhibit 323 at 3, ECF No. 248-35; Tr.4 283:9–284:21.

[31] Plaintiff Exhibit No. 61, ECF No. 243-11.

[32] Plaintiff Exhibit 64, ECF No. 243-14; Plaintiff Exhibit 62, ECF No. 243-12; Tr.4 348:16—351:21; Tr.4 359:3–361:23.

[33] Tr.4 362:5–363:8.

[34] Tr.4 268:5–22.

[35] Amendment No. 2 To Super-Priority Credit Agreement, §7, Plaintiff Exhibit 2, ECF No. 242-2.

for Invesco's Third-Out Loans. The Ad Hoc Group were not informed about this Amendment.

Robertshaw and Invesco failed to reach agreement on the terms of a new ABL facility, and the December 2023 existing ABL Facility maturity loomed. So the parties executed Amendment No. 3, which extended the November 8 deadline to November 10. The Ad Hoc Group were not informed about this Amendment.

Invesco and Robertshaw then signed Amendment No. 4 in November 2023. In exchange primarily for an extension of the time to declare an Event of Default under the SPCA until December 13, Robertshaw would start a chapter 11 bankruptcy case by no later than January 2, 2024 and, as a debtor in possession, to:

- Negotiate, in good faith, a debtor in possession financing facility, a restructuring support agreement, and a stalking horse purchase agreement with Invesco.[36]

- Confirm that the board of its parent had directed their professionals to begin the above negotiations.[37]

- Deliver to Invesco a wind-down budget following the close of the stalking-horse sale, a list of critical vendors to be paid by the debtor in possession financing along with justifications for those payments, a summary of Robertshaw's executory contracts along with recommendations regarding their treatment.[38]

Amendment No. 4 also required Robertshaw to appoint an "Independent Director" to the Board of Directors of Robertshaw's parent company. It gave the "Independent Director" sole authority to negotiate the terms of the bankruptcy milestones laid out in the Amendment.[39] Invesco selected Neal Goldman.[40] The Ad Hoc Group were not informed about this Amendment.

---

[36] Amendment No. 4 To Super-Priority Credit Agreement, §7(e), Plaintiff Exhibit 4, ECF No. 242-4.

[37] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(i), Plaintiff Exhibit 4, ECF No. 242-4.

[38] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(v), Plaintiff Exhibit 4, ECF No. 242-4.

[39] Amendment No. 4 To Super-Priority Credit Agreement, §7(f)(iv)(2), Plaintiff Exhibit 4, ECF No. 242-4.

[40] Tr.2 10:11–12:12.

Invesco was aware of Robertshaw's aversion to filing on January 2, which would have interfered with its existing turnaround plan—particularly the customer relations component.[41] There were discussions of a non-bankruptcy path.[42] Invesco ultimately declined to a discuss out-of-court alternatives until Robertshaw signed Amendment No. 4.[43] Taking his fiduciary duty as independent director seriously, Mr. Goldman instructed Robertshaw's advisors to look for alternative solutions.[44]

Invesco directed the administrative agent in writing not to post any of these amendments.[45] Based on conversations with Mr. Brooks, advisors for Robertshaw believed it would jeopardize negotiations around an out-of-court deal with Invesco if Robertshaw posted the amendments.[46] Around November 15, the Ad Hoc Group learned about the amendments when a third party casually mentioned them to an employee at Bain Capital.[47] Counsel for the Ad Hoc Group then reached out to the Administrative Agent on November 16 demanding that the amendments be posted. Amendment Nos. 1–4 were posted later that day.

## III.    The December Transactions and Amendment No. 5

After discovering the Invesco-led Amendments and looming bankruptcy, the Ad Hoc Group started working with Robertshaw and One Rock on alternative financing solutions and ultimately submitted a proposal.[48] The board's advisors presented an analysis of the relative benefits of the December Transactions compared to filing for bankruptcy on January 2. The record is undisputed that the company desperately needed the additional liquidity and runway provided by the December Transactions. Based on that analysis, the board, including Mr. Goldman, voted to approve the transactions.[49] The December Transactions consisted of six sequential steps:

---

[41] Tr.2 20:20–21:19; Tr.3 37:1–41:14.

[42] Tr.3 37:1–41:14; Joint Exhibit 25, ECF No. 250-29; Plaintiff Exhibit 91, ECF No. 243-43.

[43] Plaintiff Exhibit 91, ECF No. 243-43.

[44] Tr.2 11:3–12, 14:2–15:17.

[45] Tr.5 246:23–247:7; Deposition Testimony of Administrative Agent (Jennifer Anderson), ECF No. 312-1 at 4.

[46] Tr.6 63:7–24.

[47] Tr.4 172:2–173:3, 378:20–379:25.

[48] Plaintiff Exhibit 148, ECF No. 244-51.

[49] Tr.2 15:25–20:14, 166:8–23; Plaintiff Exhibit 247, ECF No. 246-47.

*First*, Range Parent's ("**Holdings**")[50] parent, Range Investor LLC, formed RS Funding Holdings, LLC ("**RS Funding**").[51] Holdings is Robertshaw's parent. Range Investor holds 100% of the voting interest in RS Funding.[52] Robertshaw holds 100% of the economic interest in RS Funding.[53]

*Second*, on December 11, the Ad Hoc Group and One Rock loaned $228.3 million to RS Funding ("**RS Funding Credit Agreement**").[54]

*Third*, exercising its power as 100% voting interest owner, Holdings instructed RS Funding to distribute the proceeds of the $228.3 million loan to Robertshaw.[55]

*Fourth*, Robertshaw used the funds from RS Funding to (i) pay off the outstanding $30 million ABL Facility in full; (ii) voluntarily prepay $117.6 million of the outstanding First-Out Term Loans; and (iii) pay an additional $30.7 million in required make-whole payments to the holders of First-Out Term Loans.[56] The prepayment was made to the Administrative Agent, who, in turn, disbursed the funds to the appropriate First-Out Term Loan Lenders and recorded the prepayment in the register.[57] After the prepayment, the register maintained by the Administrative Agent reflected that the Invesco no longer owned more than 50% of the combined First- and Second-Out Term Loans needed to maintain Required Lender status.[58] The Ad Hoc Group now held Required Lender status.[59]

---

[50] Super-Priority Credit Agreement at Preamble, Joint Exhibit 1, ECF No. 250-1.

[51] Plaintiff Exhibit 148 at 7, ECF No. 244-51.

[52] Plaintiff Exhibit 148 at 7, ECF No. 244-51.

[53] Plaintiff Exhibit 148 at 7, ECF No. 244-51.

[54] Plaintiff Exhibit 148 at 5, ECF No. 244-51.

[55] Plaintiff Exhibit 148 at 7, ECF No. 244-51.

[56] Plaintiff Exhibit 148 at 7, ECF No. 244-51.

[57] Tr.4 315:17–317:1.

[58] Plaintiff Exhibit 16, ECF No. 242-20.

[59] Plaintiff Exhibit 16, ECF No. 242-20.

*Fifth*, the Ad Hoc Group, as Required Lenders, executed Amendment No. 5 to the SCPA.[60] This Amendment authorized Robertshaw to issue $228 million in incremental debt.[61]

*Sixth*, once the conditions precedent to Amendment No. 5 were either met or waived, Robertshaw issued $218 million in new First-Out and Second-Out Loans.[62] Robertshaw returned an equivalent amount to RS Funding, which repaid the loan under the RS Funding Credit Agreement.[63]

Invesco received over $90 million. It tried to reject the prepayment (and now holds the funds in protest in escrow).[64] But the Administrative Agent, tasked with disbursing funds in accordance with the register, disbursed the funds to Invesco.[65] Invesco sent notice of an Event of Default under the SCPA to Robertshaw based on this allegation on December 11, 2023.[66]

Invesco challenged the prepayment as violating the SPCA because not all the proceeds were used to pay off existing indebtedness, and they were not distributed pro rata among all tranches of debt. Instead, a portion of the RS Funding cash distribution was added to Robertshaw's balance sheet, and some was used to pay off the ABL. Only the First-Out Term Loans received a prepayment. This allegedly violated § 2.11(b)(iii) and (vi) of the SPCA.

## IV.  Invesco Files Suit in New York State Court

Less than two weeks after the execution of Amendment No. 5, Invesco filed a complaint in the Supreme Court of the State of New York, asserting claims for (i) breach of the SPCA against Robertshaw and the Ad Hoc Group; (ii) breach of the covenant of good faith and fair dealing against Robertshaw and the Ad Hoc Group; (iii) tortious interference with contract against One Rock; and (iv) intentional and constructive fraudulent transfer against the Ad Hoc Group and One Rock. Invesco also sought a preliminary injunction "(i) enjoining any transactions or arrangements purportedly requiring only the consent or direction of the Ad Hoc Group and/or One Rock, including but not limited to those in Amendment No. 5,

---

[60] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[61] Amendment No. 5 To Super-Priority Credit Agreement, Plaintiff Exhibit 5, ECF No. 242-5.
[62] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[63] Plaintiff Exhibit 148 at 7, ECF No. 244-51.
[64] Tr.4 315:17–317:1; Tr.5 15:16–21.
[65] Tr.4 315:17–317:1.
[66] Plaintiff Exhibit 348, ECF No. 248-67.

(ii) enjoining the execution of Amendment No. 5 by the Administrative Agent, and (iii) reinstating of Amendment No. 4."[67]

The New York State Court did not rule on Invesco's motion before the petition date in these bankruptcy cases. This litigation is currently stayed.

## V.    Robertshaw Starts Bankruptcy Cases and the Invesco Adversary

Robertshaw started these bankruptcy cases on February 15, 2024. Robertshaw, One Rock, and the Ad Hoc Group started Adversary No. 24-03024 on the same day, seeking a declaration that the transactions, including Amendment No. 5, were valid and enforceable and that neither the Ad Hoc Group nor Robertshaw breached the SPCA by entering into them. One Rock also sought a declaration that it did not tortiously interfere with the SPCA under New York law.

Invesco filed two counterclaims seeking declaratory judgment against Robertshaw that it breached the SPCA and that Invesco was still Required Lender.[68]

After a full evidentiary trial, the Court issued the Adversary Decision. The Court found that the members of the Ad Hoc Group and One Rock were the Required Lenders under the SPCA. And the SPCA as amended by Amendment No. 5 was valid and enforceable. The Court also held that the Ad Hoc Group did not breach the SPCA, there was no breach any implied duty of good faith and fair dealing under New York law, and One Rock did not tortiously interfere with the SPCA under New York law.

The Court, however, did find that Robertshaw breached the SPCA by failing to remit 100% of the "Net Proceeds" of the $228 million loan from One Rock and the Ad Hoc Group to RS Funding. Invesco had a right to file a proof of claim in the main bankruptcy case for any alleged monetary damages arising out the breach.

Invesco filed the proof of claim. Robertshaw, the Ad Hoc Group, and One Rock objected. The Court conducted an evidentiary hearing on August 2, 2024 and took the matter under advisement.

---

[67] Plaintiff Exhibit 170, ECF No. 245-20.
[68] Invesco's Answer, Affirmative Defenses, and Counterclaims at 39, ECF No. 45.

## VI.    The Guardian Action

There was also prepetition litigation about the May Transactions. In November 2023, certain prepetition lenders sued Robertshaw, the Ad Hoc Group, and Invesco (which was aligned with the current Ad Hoc Group on this uptier) in New York State Court ("**Guardian Action**"). The Guardian Action was removed to this Court on the petition date (Adv. No. 24-03025).

In March 2024, the parties agreed on a global settlement of all claims asserted in the Guardian Action and the related adversary proceeding. In April 2024, the parties agreed to a joint stipulation staying the adversary proceeding pending negotiation of definitive documentation of the settlement.

### The Asset Auction and Sale Order

In March 2024, the Court entered an order approving Robertshaw's bidding procedures, including designation of a "Stalking Horse Bidder" (ECF No. 359). The Stalking Horse Bidder is an entity formed by or on behalf of the Ad Hoc Group and One Rock. This order established a bid deadline and auction procedures. Ultimately, neither Invesco nor any other party submitted a competing bid. So the auction was cancelled and the Stalking Horse bid was designated as the "Successful Bid."

In June 2024, the Court entered an order approving the sale of the North American Debtors' assets to the Stalking Horse Bidder (a/k/a "**Purchaser**") on the terms described in the Asset Purchase Agreement ("**Sale Order**") (ECF No. 681). The Asset Purchase Agreement includes aggregate consideration of (i) a credit bid under § 363(k) of the Bankruptcy Code for about $286 million, comprised of the principal amount of $217 million of Prepetition Secured Super-priority Claims plus accrued and unpaid interest, and about $65 million in DIP financing obligations; (ii) payment of a "Post-Effective Date Amount"; and (iii) assumption of Assumed Liabilities (as defined in the Asset Purchase Agreement).

In July 2024, Invesco sought a stay of the Sale Order pending appeal. The Court denied the motion. On August 12, 2024, the U.S. District Court for the Southern District of Texas entered an order staying the Sale Order, on an interim basis, pending full briefing and a decision on whether a stay pending appeal is merited (ECF No. 944).

13

## Summary of the Plan

In June 2024, the Court entered an order approving the Disclosure Statement for the Plan, established the deadline for objecting to confirmation of the Plan, and the confirmation hearing date (ECF No. 676).

This a liquidating chapter 11 plan. Under the Sale Order, Robertshaw intends to sell substantially all assets to Purchaser. The Plan provides for required distributions, appointment of a plan administrator to make distributions and wind up Robertshaw's estates, and a liquidating trust to administer and liquidate retained causes of action.

Under the Plan, voting classes receive the following treatment:

• Class 5 (General Unsecured Claims) will receive (a) a pro rata share of the GUC Recovery Pool (about $11 million net of Go-Forward Claims described below), and (b) its pro rata share of proceeds (if any) realized from the liquidation trustee's pursuit of retained causes of action;

• Class 6 (Funded Debt Deficiency Claims) will receive their pro rata share of a Funded Debt Deficiency Claim Pool (about $10 million), subject to the waterfall provisions of the SPCA, including treatment of interest whether accruing pre or postpetition and whether or not allowed, with the following specific treatments:

  o Class 6a (First-Out Funded Debt Deficiency Claims) will also receive a pro rata share of proceeds (if any) realized from the liquidation trustee's pursuit of retained causes of action;

  o Classes 6b (Second-Out), 6c (Third-Out), 6d (Fourth-Out), and 6e (Fifth-Out) Funded Debt Deficiency Claims will receive treatment as described for all Class 6 Claims; and

  o Classes 6f (Sixth-Out) and 6g (Seventh-Out) Funded Debt Deficiency Claims will receive treatment as described for all Class 6 Claims, but also subject to intercreditor agreements.

In addition,

Class 3 (Prepetition Secured Super-priority Claims) will receive, through an ownership interest in Purchaser, allocable share of the purchased assets and will receive no additional recovery on account of this Claim; and

Class 10 (Existing Equity Interests) will be cancelled, released and extinguished on the effective date.

14

The Plan also incorporates the terms of a settlement with the UCC ("**Committee Settlement**").

### Summary of the Committee Settlement

The Committee Settlement includes the following high-level key terms:

- Plan confirmation is a condition precedent to consummation of the sale transaction;

- Purchaser will assume prepetition General Unsecured Claims held by a creditor that provides, or will provide, goods and services necessary to the operation of Robertshaw's business after consummation of the sale transaction, as determined by Robertshaw and Purchaser, in consultation with the UCC ("**Go-Forward Trade Claims**");

- all claims or causes of action—other than retained causes of action owned by Robertshaw's estates and arising under § 547 of the Bankruptcy Code—will be discharged, released, and enjoined;

- in consideration for certain releases and exculpations in the Plan, the Ad Hoc Group and One Rock will (a) redirect any proceeds on account of the SPCA and (b) cause Purchaser to contribute to Robertshaw cash sufficient to fund administrative claims, priority tax claims, and cash to be earmarked for, a "GUC Recovery Pool" equal to $11 million;

- in settlement of any derivative or other claims that could be pursued by or on behalf of the estates against the Ad Hoc Group and One Rock, among others, holders of unsecured deficiency claims related to the SPCA (other than the Ad Hoc Group and One Rock), Sixth Out Credit Agreement, and Seventh Out Credit Agreement will share in a $10 million "Funded Debt Deficiency Pool" to be contributed by Purchaser;

- contingent on approval of the Committee Settlement and consummation of the sale transaction, the Ad Hoc Group and One Rock will not receive any payment from the Funded Debt Deficiency Claim Pool on account of First-Out Funded Debt Deficiency Claims or, with limited exceptions, Second-Out Funded Deficiency Claims; and

- holders of administrative and priority tax claims will receive cash to satisfy their claims in full.[69]

---

[69] Scruton Decl. ¶ 13, ECF No. 868-25.

15

**Summary of Invesco and U.S. Trustee Objections to the Plan**

According to Invesco, the Committee Settlement is not in the best interest of Robertshaw's estates and creditors, the Plan improperly classifies unsecured claims in violation of § 1122 of the Bankruptcy Code, the Plan unfairly discriminates against Classes 6b and 6c in violation of § 1129(b)(1), and the Plan is not feasible in violation of § 1129(a)(11). Separately, the U.S. Trustee alleges the opt-out feature for third-party releases under the Plan should be rejected in light of the recent U.S. Supreme Court decision in *Harrington v. Purdue Pharma*.

**Invesco's Objections are Overruled**

**I.      The Committee Settlement is Approved**

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe* (*In re DeBerry*), 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). The legal test is the same one used to consider settlements under Bankruptcy Rule 9019. That is whether the settlement is fair, equitable, and in the best interest of the estate. *Off. Comm. of Unsecured Creditors v. Moeller* (*In re Age Ref., Inc.*), 801 F.3d 530, 540 (5th Cir. 2015) (citation omitted). In determining whether a settlement is fair and equitable, the Fifth Circuit applies a three-part test: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including (i) the best interests of creditors, with proper deference to their reasonable views and (ii) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion. *Id.* (citations omitted).

For the first factor above, a bankruptcy court does not have to conduct a "mini-trial" to determine the "probable outcome of any claims waived in the settlement." *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Co-op., Inc.* (*In re Cajun Elec. Power Co-op., Inc.*), 119 F.3d 349, 356 (5th Cir. 1997) (citation omitted). Instead, a court must "apprise [itself] of the relevant facts and law so that

16

[it] can make an informed and intelligent decision." *Id.* "Great judicial deference is given to the [debtor's] exercise of business judgement." *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.* (*In re State Park Bldg. Grp., Ltd.*), 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (citation omitted). Thus, approval of a settlement agreement is a matter within the sound discretion of the bankruptcy court. *See United States v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F.2d 293, 297 (5th Cir. 1984), *cert. denied*, 469 U.S. 880 (1984).

Invesco says the Committee Settlement is not in the best interest of Robertshaw's estates or creditors. Invesco believes Robertshaw may pursue fraudulent transfer claims against One Rock and the Ad Hoc Group based on the December Transactions that may yield up to $228 million for the benefit of creditors. Invesco says the Committee Settlement releases these parties for about $21 million with no colorable rationale. According to Invesco, there is a high probability of success on constructive fraudulent transfer claims against One Rock and the Ad Hoc Group. Invesco also believes that there are many badges of fraud to establish that transfers were made with actual intent to hinder, delay, or defraud creditors. Not surprisingly, Invesco also says pursuing these claims will not be expensive or complicated because, among other things, the elements are "easily established," related issues have been adjudicated efficiently, and the Ad Hoc Group and One Rock have sufficient funds to satisfy a judgment.[70]

Robertshaw, the UCC, the Ad Hoc Group, and One Rock urge the Court to approve the Committee Settlement. They introduced unrefuted evidence in the Record about the UCC and Robertshaw's separate investigations and evaluation of potential claims and causes of action, including the December Transactions. They claim the Committee Settlement is fair, equitable, and in the best interest of the estates and creditors. The Court agrees.

Two investigations were conducted that strongly support approving the Committee Settlement. The first started in December 2023 when Robertshaw's Board of Directors established a "Restructuring Committee" consisting of two independent directors—Neil Goldman and Scott D. Vogel.[71] Robertshaw also retained Weil, Gotshal & Manges LLP to assist with an investigation about potential claims Robertshaw may hold against different parties, including avoidance actions.[72]

---

[70] Invesco's Obj. ¶¶ 48, 73.
[71] Vogel Decl. ¶ 7, ECF No. 868-23.
[72] Vogel Decl. ¶¶ 7, 17.

At the direction of the Restructuring Committee, Weil conducted a thorough investigation into the transactions leading up to the petition date, including the transactions that Invesco alleges are fraudulent transfers.[73] During its investigation Weil reviewed more than 16,000 documents, conducted interviews with Robertshaw's Board, senior management, and advisors, attended depositions in connection with the adversary proceeding about the December Transactions.[74] Weil also researched potential claims held by Robertshaw against any of the proposed released parties under the Plan. Potential claims included avoidance actions and breach of fiduciary duty claims against Robertshaw's Board and officers.[75]

In June 2024, Weil explained its findings to the Restructuring Committee in two parts and gave members a chance to ask questions.[76] Weil explained its findings to Goldman and Vogel about potential claims arising out of the May Transactions and Amendment Nos. 1-4 of the SPCA.[77] Then, Weil presented its findings about the December Transactions to Vogel but not Goldman. Goldman recused himself from consideration of matters related to the December Transactions because he served as an independent director during the relevant time and would receive a release under the Plan related to these Transactions.[78] Goldman and Vogel analyzed all aspects of the proposed releases under the Plan, except about the December Transactions (which only Vogel assessed).[79]

Based on a review of the factual record, Weil's findings and recommendations, the Restructuring Committee determined that viable causes of action held by Robertshaw against any of the Released Parties did not exist or that pursuing such claims had minimal value on a cost-adjusted basis.[80] So these claims held little value in light of the Committee Settlement. [81] Based on the Restructuring Committee's proposal, the full Robertshaw Board approved the Committee Settlement.[82]

The UCC also conducted its own investigations, and reached the same conclusion. The UCC—working with its counsel and financial advisors—evaluated potential causes of action held by Robertshaw for the potential benefit of unsecured

---

[73] *See* Vogel Decl. ¶ 17.
[74] Vogel Decl. ¶ 17.
[75] Vogel Decl. ¶ 17.
[76] Vogel Decl. ¶ 18.
[77] Vogel Decl. ¶ 19.
[78] Vogel Decl. ¶ 19.
[79] Vogel Decl. ¶ 21.
[80] Vogel Decl. ¶ 22; Aug. 2, 2024 Tr. 21:4–12.
[81] Vogel Decl. ¶ 22; Aug. 2, 2024 Tr. 21:4–12.
[82] Vogel Decl. ¶ 23; Aug. 2, 2024 Tr. 21:4–12.

creditors.[83] That included causes of action that could be brought against One Rock and Robertshaw's current and former directors and officers.[84] It also included potential claims the UCC could be entitled to bring on behalf of the estate, including fraudulent transfer claims.[85] During its investigations, the UCC, through its counsel, reviewed thousands of documents, participated in numerous depositions, held an in-person meeting with Invesco representatives and counsel, and met with Robertshaw's independent directors to gain an understanding of their views on potential claims.[86]

The UCC prepared an adversary complaint and was prepared to seek standing to pursue causes of action against One Rock, the Ad Hoc Group, and Invesco.[87] The UCC also considered potential settlements, including a global settlement with One Rock, the Ad Hoc Group, and Invesco.[88] Ultimately, after weeks of negotiations, the UCC executed a settlement agreement with Robertshaw, the Ad Hoc Group, and One Rock.[89]

The UCC considered the factors below in entering into the Committee Settlement:

- the merits of the potential estate claims and causes of action identified in its draft complaint;

- the costs versus the benefits of litigating such claims and causes of action;

- the merits of potential safe harbor defenses to the fraudulent conveyance claims;

- the risk that viewing the steps of the December Transactions as an integrated transaction would undermine the chances of prevailing on a fraudulent transfer claim; [90]

---

[83] Scruton Decl. ¶ 7.

[84] Scruton Decl. ¶ 7.

[85] Scruton Decl. ¶ 8.

[86] Scruton Decl. ¶ 8.

[87] Scruton Decl. ¶ 8.

[88] Scruton Decl. ¶ 11.

[89] Scruton Decl. ¶ 11.

[90] Fraudulent transfer law generally requires a court to analyze each transaction separately. But there is an equitable doctrine that allows courts to "dispense with the structure of structures of a transaction or series of transactions." *See, e.g.*, *In re Maxus Energy Corp.*, 641 B.R. 467, 531–32 (Bankr. D. Del. 2022). The potential net effect of these transactions in a fraudulent transfer context

- the fact that holders of Funded Debt Deficiency Claims may be subject to disallowance, subordination, and other claims that could affect their ability to receive a recovery on account of their Claims under the Plan; and

- the fact that there were no other bids for the sale of Robertshaw's assets such that litigation with the Ad Hoc Group and One Rock might threaten the sale transaction, Robertshaw's ability to exit chapter 11, and future of Robertshaw as a go-forward business.[91]

After a careful and thorough investigation and analysis, the UCC concluded that the probability of a successful recovery for all unsecured creditors was uncertain, and the attendant risk and expenses of litigation weighed in favor of the certainty of the Committee Settlement.[92]

Based on the Record, the Court approves the Committee Settlement. It is fair and equitable, and in the best interest of Robertshaw's estates and creditors. The probability of success in litigating fraudulent transfer claims about the December Transactions is complex and will require analyzing many disputed issues of fact and law.

This Court conducted a trial about the December Transactions, but that will not streamline many fact intensive issue related to solvency, intent to hinder, delay, or defraud creditors, and reasonably equivalent value. Complicating matters more, the transferee in the December Transactions was an entity named RS Funding, which eventually merged into Robertshaw and no longer exists. Moreover, establishing badges of fraud in intentional fraudulent transfer cases is inherently fact intensive. And the focus would be on Robertshaw's alleged fraudulent intent as the transferor, not the Ad Hoc Group or One Rock's intent. There is no assurance Robertshaw would prevail.

Furthermore, the Record shows that Robertshaw engaged in the December Transactions to afford itself "time and runway" to, among other things, negotiate with customers, implement their out-of-court restructuring efforts, or, in the worst-case scenario, negotiate the terms of a chapter 11 plan that would benefit all stakeholders.[93] This Court also previously found in the Adversary Decision that the

---

could mean that Robertshaw received reasonably equivalent value, which would negate a constructive fraudulent transfer claim.

[91] Scruton Decl. ¶ 15. Again, Invesco had a full and fair opportunity to participate in the auction for the sale of Robertshaw's assets and elected no to do so.

[92] *See* Scruton Decl. ¶¶ 13, 17.

[93] Goldman Decl. ¶ 9.

members of the Ad Hoc Group and One Rock engaged in the December Transactions to, among other things, increase Robertshaw's liquidity and allow the company to continue its turnaround plan and that One Rock did not tortiously interfere with the SPCA.

The negotiations between the UCC and other settlement parties were the product of extensive arm's-length bargaining. The UCC is a true independent party who actively participated in these cases and considered the interest of all unsecured creditors. No one also disputes that the Restructuring Committee acted independently. There is also no evidence of fraud or collusion here. The Restructuring Committee and the UCC conducted extensive analysis about potential claims, potential defenses to these claims, and the probability of success. They independently concluded that potential defendants have meritorious defenses and the cost to litigate fraudulent transfer claims about the December Transactions will be complicated, expensive, and long.

The Court considered the paramount interest of the estates and creditors, including Invesco and every creditor who rejected the Plan. A meaningful and certain recovery now rather than the uncertainty of a complex litigation, including what happens to the business during such litigation and the proposed sale of Robertshaw's assets, reflects Robertshaw's sound exercise of business judgment.

The Court approves the Committee Settlement.

## II.       The Plan Properly Classifies Claims Under Section 1122 of the Bankruptcy Code

Section 1122(a) of the Bankruptcy Code provides that a "plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Substantially similar claims may be separately classified for "good business reasons." *Bank N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 251 (5th Cir. 2009) (quoting *Phoenix Mut. Life Ins. v. Greystone III Joint Venture* (*In re Greystone III Joint Venture*), 995 F.2d 1274, 1281 (5th Cir.1991), *cert. denied,* 506 U.S. 821 (1992)). But it "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Greystone*, 995 F.2d at 1279. Robertshaw bears the burden of proving classification is proper by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II* (*In re Briscoe Enters., Ltd., II*) 994 F.2d 1160, 1165 (5th Cir. 1993). Based on the Record, the Court finds the classification scheme in the Plan complies with the requirements of § 1122(a).

Invesco argues that there is "no apparent business justification for the Plan's separate classification of General Unsecured Claims and Funded Debt Deficiency Claims" because the general unsecured creditors in Class 5 includes unsecured claims that are not Go-Forward Trade Claims.[94] The unrefuted evidence, however, proves otherwise.

The Spitzer Declaration, as modified at the confirmation hearing, established that the vendor community for Robertshaw's business is relatively small and specialized.[95] And Robertshaw's "ability to maintain good relationships with vendors has certain value for the company's ongoing relationship even if [Robertshaw] does not utilize their services on a go-forward basis."[96] Also, the "majority of Holders of General Unsecured Claims are trade creditors who have the potential to reestablish a relationship with [Robertshaw] in the future."[97] So even if some trade creditors in Class 5 are not Go-Forward Trade Claims now, there is still reason to believe that "[Robertshaw] may need to utilize several of the class five creditors in the Debtors' day-to-day operations going forward."[98]

There is another reason. Each Class 6 Deficiency Class's right to recovery against Robertshaw is determined by the waterfall provisions in the SPCA. The Plan's classification scheme mirrors the waterfall in the SPCA keeping like claims with like claims and the legal relations among the parties intact. In other words, claims "which share common priority and rights against the debtor's estate" have been classified together. *Save Our Springs (S.O.S.) All., Inc. v. WSI (II)-COS, L.L.C., (In re Save Our Springs (S.O.S.) All., Inc.*), 632 F.3d 168, 174 (5th Cir. 2011).

Along with treating each sub-class of Funded Debt Deficiency Claims as a separate voting class, the separate legal rights as between the General Unsecured Claims in Class 5 and the Funded Debt Deficiency Claims in Class 6(b) and 6(c) justify their separate classification too. The claims in Class 6 derive from the SPCA and Class 5 claims derive from Robertshaw's business operations.

---

[94] Invesco's Obj. ¶ 88.
[95] Spitzer Decl. ¶ 22, ECF No. 868-22.
[96] Aug. 2, 2024 Tr. 31:18–32:13.
[97] Spitzer Decl. ¶ 21.
[98] Aug. 2, 2024 Tr. 30:14–31:5, 32:4–13.

Thus, the Plan separately classifies Claims based on valid business and legal reasons. The classifications were not proposed to create a consenting impaired class or to manipulate class voting. The Plan satisfies § 1122.

### III.      The Plan Does Not Discriminate Unfairly in Violation of Section 1129(b)(1) of the Bankruptcy Code

Section 1129(a) of the Bankruptcy Code says that a bankruptcy court shall confirm a plan only if all the requirements under subsection (a) are met. 11 U.S.C. § 1129(a). Section 1129(a)(8) requires all impaired classes to vote for the plan. But that's not the end of the analysis. Section 1129(b) permits plan confirmation, despite § 1129(a)(8), if all (i) other requirements under 1129(a) are met and (ii) the plan does not discriminate unfairly, and is fair and equitable, with respect to an impaired non-accepting class. 11 U.S.C. § 1129(b)(1). So a plan may discriminate between classes, but it cannot discriminate unfairly. Invesco notes that Classes 6b and 6c Funded Debt Deficiency Claims rejected the Plan.[99] So Robertshaw bears the burden to prove by a preponderance of the evidence that the Plan does not discriminate unfairly against these Classes.

The Bankruptcy Code does not define what it means to "discriminate unfairly." Courts generally assess unfair discrimination based on the facts and circumstances presented in the case. *See, e.g.*, *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), aff'd, 662 F.3d 315 (5th Cir. 2011). In other words, "for payment to be preferred to one creditor or class over others, the [c]ourt must find an articulable basis for the preference." *In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 614–15 (Bankr. W.D. Tex. 1990). Some courts have utilized multi-factor tests[100] or rebuttable presumption tests[101] as an analytical framework to assess unfair discrimination. They are helpful considerations, but could be construed to either create additional burdens on the debtor to satisfy this prong or appear to repeat standards already required in other parts of § 1129 required for confirmation. The text requires a plan not to unfairly discriminate against an impaired non-accepting class. Thus, Robertshaw must articulate a basis for discriminating between two classes and show by a preponderance of the evidence that such discrimination is not unfair to impaired rejecting classes.

---

[99] Invesco's Obj. ¶ 76.

[100] *In re Creekside Landing, Ltd.,* 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992) ((1) Whether the discrimination is supported by a reasonable basis, (2) Whether the debtor can confirm and consummate a plan without the discrimination, (3) Whether the discrimination is proposed in good faith, and (4) The treatment of the classes discriminated against)).

[101] *In re Sentry Operating Co. of Tex., Inc.,* 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001) (using rebuttable presumption multi-factor test).

Invesco argues Robertshaw cannot satisfy its burden with respect to Classes 6b and 6c as compared to the percentage recovery to holders of Class 5 General Unsecured Claims. It argues that Classes 6b and 6c are of equal rank and priority with General Unsecured Claims and Go-Forward Trade Claims in Class 5 because they are all unsecured, non-priority claims. Based on the Disclosure Statement, Class 6b creditors are estimated to receive a 5% recovery and Class 6c creditors may receive no recovery.[102] But Class 5 creditors are estimated to recover about 40% and Go-Forward Trade Claims will recover 100%.[103] And, unlike holders of Go-Forward Trade Claims, other Class 5 creditors will supposedly not contribute in any way to Robertshaw's business in the future. The Court disagrees with Invesco. Based on the unrefuted Record, the Plan does not discriminate unfairly against the dissenting classes.[104]

First, the evidence shows that there is a business justification for the discrimination. Go-Forward Claims are being paid by Purchaser and will provide future business to the company. Many other holders of general unsecured claims are potential trade vendors that Robertshaw may do business with in the future.[105] Discriminating between trade claims that may give rise to future business dealings compared to Funded Debt Claims, for which the evidence shows will not contribute similarly on a go-forward basis, [106] does not amount to unfair discrimination. There is no material evidence in the Record proving otherwise.

Second, no unsecured creditor is entitled to a greater recovery than they are receiving under the Plan. The liquidation analysis confirms this point.[107] Robertshaw is selling substantially all assets to Purchaser—including cash. Moreover, the final order approving debtor in possession financing (ECF No. 357) provides that the Prepetition First Out Super-Priority Secured Parties (as defined in the order) hold valid liens on "substantially all of the assets" of Robertshaw.[108] So the only unencumbered cash available for distribution to unsecured creditors will come from Purchaser as a gift.

---

[102] Invesco's Obj. ¶ 39; Disclosure Statement at 42, ECF No. 868-16.

[103] Spitzer Decl., Exhibit. B.

[104] For the reasons stated above, the Plan satisfies any of these other unfair discrimination standards.

[105] Spitzer Decl. ¶ 21.

[106] Spitzer Decl. ¶ 21.

[107] Spitzer Decl., Exhibit A.

[108] *See* DIP Order ¶ E.1(a)(i), (ii), ECF No. 357.

As part of the Committee Settlement, Purchaser will provide the cash to pay Class 5 General Unsecured Claims and Class 6 Funded Debt Deficiency Claims.[109] Purchaser will provide $10 million for Class 6 Claims to be disbursed on a pro rata basis in accordance with the SPCA and $11 million for Class 5.[110] Senior creditors may share proceeds with junior creditors as long as the junior creditors receive what they would have received otherwise without such sharing. *In re MCorp Financial, Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993); *see also In re Nuverra Evtl. Sols., Inc.*, 590 B.R. 75, 95 (D. Del. 2018). Here, based on § 506(c) of the Bankruptcy Code, the Funded Debt Deficiency Claims are junior to the Prepetition Secured Super Priority Claims credit bid.

Under the Committee Settlement the Ad Hoc Group and One Rock also agree to waive any recovery on account of their respective Class 6a Claims and allow value to flow to Class 6b Claims.[111] Under § 2.18(b) of the SPCA, Prepetition First-Out Term Loans recover in full before Prepetition Second Out Term Loans and junior tranches. So the remaining First-Out Funded Debt Deficiency Claims will recover in full the allowed amounts of their claims, and the excess value will flow to Class 6b. The Ad Hoc Group and One Rock also agree to waive any recovery on account of their Class 6b Claims.[112] As a result, the non-waiving holders in Class 6b are estimated to receive a greater recovery on account of their Claims.[113] According to the unrefuted Spitzer Declaration, "because the Ad Hoc Group holds approximately 51% of the Prepetition Second Out Term Loans, they are essentially providing $20 million of value to the Funded Debt Deficiency Claim Pool."[114] Non-waiving holders of claims in these and other Class 6 creditors may also receive increased recovery from retained causes of action.

For these reasons, there are business and legally sound reasons for the treatment afforded to Class 5 and Class 6. The Plan does not unfairly discriminate against any dissenting classes. Section 1129(b)(1) is satisfied.

---

[109] Spitzer Decl. ¶ 71; Plan at 3 (definition of "Additional Sale Consideration").

[110] *See* Plan at 3 (definition of "Additional Sale Consideration"); Spitzer Decl. ¶ 71; Vogel Decl. ¶ 10(c), (d).

[111] Vogel Decl. ¶ 11.

[112] Vogel Decl. ¶ 11.

[113] Spitzer Decl. ¶ 12, Exhibit B.

[114] Spitzer Decl. ¶ 12 n.4.

IV.     The Plan is Feasible Under
        Section 1129(a)(11) of the Bankruptcy Code

Section 1129(a)(11) requires that confirmation "of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

This is a liquidating chapter 11 plan. So feasibility is established when the liquidation itself is feasible. *See e.g., In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007). Funding from Purchaser will be disbursed in accordance with Plan. Any remaining assets, including retained causes of action, will be administered through the plan administrator or the liquidation trust.[115] Robertshaw and its professionals analyzed the ability to meet obligations under the Plan and project that there are sufficient amounts to pay professional fee claims, administer the wind down of Robertshaw's estates, and make required Plan distributions.[116] And Article V.F of the Plan says that if there is a shortfall Purchaser will fund the extra amounts to the "Additional Sale Consideration, the Professional Fee Escrow Amount, and the Wind-Down Reserve."[117]

Invesco argues that the Plan is not feasible "because it does not account for at least $118.4 million to $154.4 million in damages and indemnifiable and reimbursable expenses that Invesco has asserted in its proof of claim, which are secured and must be paid before the Ad Hoc Group and One Rock's credit bid may be consummated."[118] This Court recently held a separate evidentiary hearing about Invesco's proof of claim. Invesco's lack of evidence coupled with bedrock New York law cause Invesco to hold only an unsecured claim that will not impact Plan feasibility. The Court will issue a separate decision detailing its findings of fact and conclusions of law on Invesco's proof of claim. The Plan complies with § 1129(a)(11).

---

[115] Spitzer Decl. ¶ 70.
[116] Spitzer Decl. ¶ 71.
[117] Spitzer Decl. ¶ 71; *see also* Plan at 36 ("[I]f the Retained Cash is insufficient to fund the Additional Sale Consideration, the Professional Fee Escrow Amount and the Wind-Down Reserve, the Purchaser shall fund all necessary additional amounts on or prior to the Effective Date.").
[118] Invesco's Obj. ¶ 92.

### The U.S. Trustee's Objection is Overruled

The Supreme Court's recent decision in *Harrington v. Purdue Pharma* resolved a circuit-split about non-consensual third-party releases in chapter 11 plans. The Court held that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Purdue Pharma*, 144 S. Ct. at 2088. Even before *Purdue*, Fifth Circuit case law appeared to prohibit non-consensual third-party releases. *See Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746 (5th Cir. 1995); *In re Pac. Lumber Co.*, 584 F.3d 299. So *Purdue* did not change the law in this Circuit.

The Plan does not include non-consensual third-party releases like the ones addressed in *Purdue*. It contains consensual ones. So the *Purdue* decision does not apply here. The U.S. Trustee provided comments to Robertshaw on the Plan solicitation materials before they were approved by this Court.[119] Now it objects to the consensual third-party releases on the basis of the *Purdue* decision. The Trustee wants to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out.

To be clear, the Trustee does not object to consensual third-party releases in a chapter 11 plan, it just wants opt-in versus opt-out. The Trustee says that *Purdue* clarifies that third-party releases are between two nondebtors (but that was always the case). The Trustee also says the opt-outs are "coercive" and otherwise improper. Robertshaw, the Ad Hoc Group, One Rock, and the UCC argue the third-party releases are appropriate under the law.

The Trustee's objection is overruled for several reasons. First, the *Purdue* decision was about non-consensual third-party releases and the Supreme Court said nothing should cast doubt on consensual ones:

> As important as the question we decide today are ones we do not. ***Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan***; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. *See, e.g., In re Specialty Equipment Cos.*, 3 F.3d 1043, 1047

---

[119] Aug. 2, 2024 Tr. 123:12–19.

> (CA7 1993). ***Nor do we have occasion today to express a view on what qualifies as a consensual release*** or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor . . . ***Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants***.

*Purdue Pharma*, 144 S. Ct. at 2087–88 (emphasis added).

A few important points here. Nothing is construed to question consensual third-party releases offered in connection with a chapter 11 plan. There was also no occasion for the Supreme Court to express a view on what constitutes a consensual release. The Supreme Court confined its decision to the question presented. This Court will not narrow or expand the scope of the Supreme Court's holding. These words must be read literally.

Second, contrary to the Trustee's position, the consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out. There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. *See, e.g.*, *In re Arsenal Intermediate Holdings, L.L.C.*, No. 23-10097 (CTG), 2023 WL 2655592, at *6–8 (Bankr. D. Del. Mar. 27, 2023).[120] And what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this District. *See, e.g.*, *Cole v. Nabors Corp. Servs., Inc.* (*In re CJ Holding Co.*), 597 B.R. 597, 608–09 (S.D. Tex. 2019). Hundreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out. And, again, *Purdue* did not change the law in this Circuit.

The third-party releases in the Plan satisfy applicable law and the Procedures for Complex Cases in the Southern District of Texas. Parties in interest were provided detailed notice about the Plan, the deadline to object to plan confirmation, the voting deadline, and the opportunity to opt out of the third-party releases. The Disclosure Statement included a detailed description about the third-

---

[120] The U.S. Supreme Court and the Fifth Circuit have also approved opt-outs in non-bankruptcy cases like class actions as providing consent. *See, e.g.*, *Phillips Petroleum Co. v. Irl Shutts*, 472 U.S. 797, 811–12 (1985) (approving opt-out); *Seacor Holdings, Inc. v. Mason, (In re Deepwater Horizon)*, 819 F.3d 190 (5th Cir. 2016) (same).

party releases and the opt-out.[121] The Affidavit of Service dated July 26, 2024, also shows ballots were sent to holders of Claims in voting classes 5, 6a, 6b, 6c, 6d, 6e, 6f, and 6g.[122] All ballots provided claimants an opportunity to opt out. Non-voting parties in Classes 1, 2, 3, 4, 7, 8, 9, and 10 received a Notice of Non-Voting Status that offered a chance to opt out too.[123] The ballots and the Notice of Non-Voting Status allowed parties to carefully review and consider the terms of the third-party release and the consequences of electing not to opt-out. Each of the ballots advises in bold, that:

> **If you submit your Ballot without this box checked, or if you do not submit your Ballot by the Voting Deadline, you will be deemed to consent to the releases contained in Article X.C of the Plan to the fullest extent permitted by applicable law.**[124]

Robertshaw also caused the third-party release language to be published in the Wall Street Journal.[125] The Voting Report shows that over 100 creditors opted out of the third-party releases.[126] Based on the Record, the third-party release language is specific enough to put releasing parties on notice of the types of claims released. And that the opt-out worked. There is no evidence in the Record of coercion or confusion alleged by the Trustee.

The third-party releases are also narrowly tailored to this case. They consensually release parties from claims and causes of action based on or relating to, among other things, Robertshaw and the bankruptcy estates, Robertshaw's capital structure, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of Robertshaw, the May Transactions, the December Transactions, the SPCA and related agreements (including intercreditor agreements), Robertshaw's in or out-of-court restructuring and recapitalization efforts, the Sale Order, the Disclosure Statement, the DIP Order, the DIP documents, and the Plan and related agreements.[127] There is also an important carve-out for Released Claims unrelated to Robertshaw, claims preserved by the Plan or related documents, or claims arising from an act or omission judicially determined by a final order to have constituted actual fraud, gross negligence,

---

[121] Disclosure Statement at ii, v, 5, 58, 61.

[122] Aff. Service, ECF No. 812.

[123] *See* Aff. Service at 136–39.

[124] *See* Aff. Service at 26, 41, 55, 69, 83, 97, 111, 125.

[125] *See* Certificate Publication, ECF No. 728.

[126] *See* Orchowski Decl. ¶ 12, ECF No. 868-21.

[127] Plan at 65.

willful misconduct, or criminal conduct (other than with respect to or relating to the adversary actions).[128]

Furthermore, based on the unrefuted Declaration of Stephen Spitzer, the third-party release "is an integral part of the Plan and was a condition of the settlements set forth therein."[129] And the releases were a "core" consideration "among the parties to the Restructuring Support Agreement, instrumental in the development of the Plan, and crucial in facilitating and gaining support for the Plan and the chapter 11 Cases by the Released Parties, including the concessions resulting in the elimination of over $640 million in funded debt obligations."[130] There is no evidence in the Record to refute these findings. Thus, the third-party releases are consensual and narrowly tailored. The UCC—an active participant in these cases with a fiduciary duty to all unsecured creditors—doesn't oppose the opt-out for the releases either. The U.S. Trustee's objection is overruled.[131]

## Conclusion

For the reasons stated above, the Plan, including the Committee Settlement, satisfies all requirements under the Bankruptcy Code and applicable law. The Plan preserves and creates value for all stakeholders, including trade creditors on a go-forward basis. It also allows a company with a proud American history of operating for over 100 years to emerge from chapter 11 and saves jobs. The Court confirms the Plan. The Court will issue a separate confirmation order incorporating this Memorandum Decision.

Signed:  August 16, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

---

[128] *Id.*

[129] Spitzer Decl. ¶ 60.

[130] Spitzer Decl. ¶ 60; *see also* Vogel Decl. ¶ 30.

[131] The U.S. Trustee and Invesco stated at the confirmation hearing that certain language in the Plan could be construed to still bind a third-party subject to the releases even if they opted out. To avoid any such confusion, the Confirmation Order will state that any party who opted out of the third-party releases in the Plan is not bound by such releases.